UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH BONDERER,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>GENA JONES, Warden,<br><br>　　　　　Respondent.[1] | No. 2:20-cv-0415 DAD AC<br><br><br>ORDER AND<br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner is a California state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The action proceeds on the petition challenging petitioner's 2016 conviction for kidnaping for purpose of rape and related offenses. ECF No. 1. Respondent has answered, ECF No. 16, and petitioner has filed a traverse, ECF No. 21. Claims Three through Five have been dismissed on petitioner's motion, and the case proceeds on Claims One and Two only. ECF Nos. 18, 20.

////

////

---

[1] A federal petition for writ of habeas corpus must name as respondent the state officer having custody of the petitioner. See 28 U.S.C. § 2254; Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts; Smith v. Idaho, 392 F.3d 350, 354-55 (9th Cir. 2004). Accordingly, Gena Jones, Warden of California Health Care Facility (petitioner's current place of incarceration, see ECF No. 34), is substituted as respondent herein.

1

BACKGROUND

I. Proceedings in the Trial Court

A. Preliminary Proceedings

Petitioner was charged in Sacramento County with kidnapping for the purpose of rape, forcible rape, forcible sodomy, and related counts and enhancements.

Petitioner brought a motion in limine to exclude evidence of a single-photograph identification of petitioner by the victim, and any subsequent in-court identification. 1 CT 139-149 (ECF No. 14-1 at 131-141). The motion was denied following argument. 1 RT 50-54 (ECF No. 14-2 at 57-61).

Petitioner also moved to suppress the results of DNA testing. 1 CT 152, 160 (ECF No. 14-1 at 144, 152). The motion was denied following an evidentiary hearing. 1 RT 103-104 (ECF No. 14-2 at 110-111).

B. The Evidence Presented at Trial[2]

1. Prosecution Case

In October 2013, S. lived in Orangevale with her husband and son. On the night of October 30, she realized she did not have milk for her son's cereal the following morning and drove to a nearby Walmart to pick some up. When she returned to her car, S. put the groceries in the trunk and then got into the car to drive away. As she started the engine, petitioner emerged from between two cars, opened the front passenger side door, and got inside. S. described him as a tall white man wearing jeans and a black T-shirt with a skull on the front. He had one of his hands beneath his shirt, causing S. to believe he had a gun and was there to rob her. She was terrified. Petitioner told her not to scream and threatened to kill her if she did not do as he said. After S. indicated she would do so, petitioner told her to drive. S. complied and told petitioner she did not have any money. Petitioner responded: "I know you don't have money." He then demanded to have sex with her and threatened to kill her if she did not do so.

Meanwhile, S. had pulled out of the Walmart parking lot and was driving northbound on

---

[2] The following summary is adapted from the opinion of the California Court of Appeal. ECF No. 14-7 at 3-6.

1  Hazel Avenue.  When they approached a synagogue on the left side of the road, petitioner told her
2  to pull into that parking lot.  S. complied.  At petitioner's direction, S. parked the car.  Petitioner
3  then said there were too many lights in the parking lot, and told her to back out of the parking
4  space and continue driving.  S. again complied, turned onto Hazel, and continued northbound.  S.
5  asked where they were going.  Petitioner answered: "I'll figure it out."  He then directed her to a
6  more secluded location off of Old Auburn Road and told her to park and turn off the engine and
7  headlights.  S. complied with these commands as well.

8        After S. turned off the engine, petitioner took the keys and told her to get out of the car.
9  As she did so, petitioner also got out and told her to come over to him.  When S. got to the
10 passenger side, petitioner positioned himself behind her and told her to pull her pants down and
11 place her hands on the hood of the car.  S. again complied.  Petitioner pulled down S.'s underwear
12 and penetrated her vagina and anus with one of his fingers.  He then penetrated her vagina with
13 his penis, commented that her vagina was "so small," and spit on his hand to lubricate his penis
14 before reinserting it into her vagina.  Petitioner also penetrated S.'s anus with his penis.  When S.
15 yelled out that he was hurting her, petitioner said: "Don't yell."  He eventually stopped his
16 assault, saying she was "too small," and told her to pull her pants back up.  Petitioner then told S.
17 to drive him back to the Walmart.  During the return drive, he said his life was "a mess" and told
18 her not to tell anyone about what happened.  When they arrived, petitioner demanded to see her
19 breasts.  When she complied, he kissed and licked one of her breasts before getting out of the car.

20       When S. got home after these traumatic events, she told her husband what happened and
21 her son called 911.  During the call, S. provided the dispatcher with a description of her attacker
22 and repeated that description to officers who responded to her house.  Officers immediately
23 canvassed the area and talked to the doorman at a bar across the street from the Walmart,
24 providing him with the description of the perpetrator.  The doorman told the officers a man who
25 matched the description was at the bar a short time before the crimes were committed.  That man
26 was identified as petitioner.  The doorman had swiped his driver's license through a handheld
27 device as he entered the bar.  Information from that device was given to the officers, revealing
28 that petitioner lived in an apartment complex on Hazel Avenue about 200 feet from the Walmart.

Petitioner had been at the bar for only 10 or 15 minutes. During that time, he made derogatory comments about women that caused one of the bartenders to approach the doorman and tell him to "keep an eye on him." Specifically, while petitioner was in the restroom, he told another bar patron that "it would be better if [women] had no mouths, just tits and ass." He then came out of the restroom and stared at several women at the bar and in the band that was playing that night. Petitioner left a few minutes later.

Surveillance video from the Walmart parking lot captured footage of petitioner walking around the parking lot for about 30 minutes before getting into S.'s car. During this time period, he approached another woman who was returning to her car. As this woman, L., described in her testimony: "I felt someone or something coming up behind me very quickly. And I turned around. And I saw that man right there behind me, and I literally just stopped and stared at him." After identifying petitioner as the man to whom she was referring, L. continued: "And we just both stopped for a moment. And then I didn't move, and then he crossed over to the parking lot to the other side. And I just kind of watched him walk, and he went over and got a shopping cart from the end [of] one of the aisles and he walked it over to another shopping cart." L. then got into her car, locked the door, and drove out of the parking lot. A few minutes after this encounter, which was also captured on the Walmart surveillance system, the footage shows S. returning to her car, putting the groceries in the trunk, and then getting into the driver's side, after which petitioner emerges from shadow and enters the car through the passenger side door.

During a subsequent search of petitioner's apartment, officers found the distinctive black T-shirt with a skull on the front described by S. and the doorman and bartender from the bar.

A sample of petitioner's DNA was taken following his arrest. A profile was generated from that sample and compared to a partial profile generated from a sample obtained from the underwear S. was wearing that night. Petitioner's profile was a match for the partial profile. The probability of a random match occurring among the Caucasian population was one in 130 billion.

C. Outcome

Petitioner was found guilty of one count of kidnapping for purposes of rape, two counts of forcible sexual penetration, one count of forcible rape, one count of forcible sodomy, and one

4

count of simple kidnapping. With respect to the sexual offenses, the jury also found a one strike allegation to be true, i.e., that petitioner kidnapped S. and the movement substantially increased the risk of harm to her over and above the level of risk necessarily inherent in the underlying offense.

The trial court sentenced petitioner to serve an aggregate indeterminate term of 100 years to life in state prison.

II.     Post-Conviction Proceedings

Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of conviction on May 30, 2019. ECF No. 14-7. The California Supreme Court denied review on August 28, 2019. ECF No. 14-9.

Petitioner filed no applications for state collateral relief.

STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. Harrington v. Richter, 562 U.S. 86, 99 (2011). State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state-law procedural principles to the contrary. Id. (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's

decision is more likely." Id. at 99-100.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent." Marshall v. Rodgers, 569 U.S. 58, 64 (2013).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407-08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

Review under § 2254(d) is limited to the record that was before the state court. Cullen v. Pinholster, 563 U.S. 170, 180-181 (2011). The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it. Id. at 181-182. In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." Id. at 182. Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis." Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc). A different rule applies where the state court rejects claims summarily, without a reasoned opinion. In Richter, supra, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny. Richter, 562 U.S. at 102.

////

////

////

# DISCUSSION

I. Claim One: Unreliable Identification Evidence Violated Due Process

A. Petitioner's Allegations and Pertinent State Court Record

Petitioner contends that his due process rights were violated by his in-court identification by the victim, because that identification was tainted by an unfairly suggestive and unreliable single-photo identification. ECF No. 1 at 4, 11. The petition incorporates the following factual basis as set forth in petitioner's Opening Brief on appeal:

> […] Samantha Doe was kidnaped and assaulted sometime after 10:30 p.m. on October 30, 2013. (1 RT 144–145, 170–172.) Doe's family called 911 at around 11:35 p.m. that night to report the incident. (1 CT 140.) Some five hours later, police showed Doe a six pack of photos. She identified someone other than Appellant as the suspect. (1 CT 140, 1 RT 208.)[3]
>
> Doe was subsequently interviewed by a police detective on November 4, 2013, apparently at her home. (1 RT 193, 1 RT 52.) She was shown a single photo of Appellant and identified him as her assailant. This photo had previously been released to social media and the Sacramento Bee and Doe admitted having already seen it. (1 RT 209.)
>
> At trial, Doe was initially unable to identify Appellant. (1 RT 143.) However, after a recess occasioned by her becoming upset when shown photographs of the location of the sexual assault (1 RT 161), Doe was again asked if she could identify in court her attacker. At that time she identified Appellant. (1 RT 178.)
>
> Defense counsel unsuccessfully moved to exclude the suggestive identification and the subsequently tainted in court identification. (1 CT 139–149.) The trial court denied the motion, noting that "There is no prejudicial police conduct that took place." (1 RT 54.)
>
> Appellant contends that the use of a single photo identification procedure was unduly suggestive resulting in an unreliable identification, which tainted the subsequent in court identification, and that this error was prejudicial.

ECF No. 1 at 32-33.

////

////

---

[3] The one-volume Clerk's Transcript on Appeal is docketed at ECF No. 14-1. The first volume of the Reporter's Transcript on Appeal is at ECF No. 14-2.

The trial court explained its ruling on the matter as follows:

> There is no prejudicial police conduct that took place. [¶] All the circumstances surrounding [the] identification, if [S.] identifies him at all[,] will be permitted to be gone into, including the fact that she saw it on television. That will be asked in front of the jury. What her words were to the detective, if any, when she saw the single photograph, her emotional reaction, if any, that occurred during the [seeing] of that photograph, the fact that she misidentified somebody on a prior occasion, all of that will come before the jury. And they will take that in addition to any other evidence that either tends to include you or exclude you as being the person involved in this incident. That's what the jury is here to decide, whether you had anything to do with this or not, and whether the People can prove that you had something to do with it or not through competent evidence. [¶] The jury will be able to hear all of those pieces of the equation and then ultimately make their own determination as to whether that accurately connects you to the commission of the crime. So the motion to suppress her identification is denied.

1 RT 54 (ECF No. 14-2 at 61).

### B. The Clearly Established Federal Law

Due process does not necessarily require the exclusion of evidence, including eyewitness identification, that presents serious reliability problems. See Perry v. New Hampshire, 565 U.S. 228, 245 (2012). In certain cases, due process may require the suppression of an eyewitness identification that is tainted by improper police-arranged procedures. Due process is implicated only when law enforcement officers use an identification procedure that is both suggestive and unnecessary. Manson v. Brathwaite, 432 U.S. 98, 107, 109 (1977); Neil v. Biggers, 409 U.S. 188, 198 (1972). Even when the police use such a procedure, however, suppression of the resulting identification is not the inevitable consequence. Brathwaite, 432 U.S. at 112-113; Biggers, 409 U.S. at 198-199. Instead, due process requires courts to assess, on a case-by-case basis, whether improper police conduct created a "substantial likelihood of misidentification." Id. at 201. Where the "indicators of [a witness'] ability to make an accurate identification" are "outweighed by the corrupting effect" of law enforcement suggestion, the identification should be suppressed. Brathwaite, 432 U.S. at 114. However, absent "a very substantial likelihood of irreparable misidentification," Simmons v. United States, 390 U.S. 377, 384 (1968), the reliability and evidentiary value of the identification should be submitted to the jury. In that case due

process is satisfied by the defendant's opportunity to challenge the reliability of the identification before the jury. Perry, 565 U.S. at 245-247.

### C. The State Court's Ruling

This claim was raised on direct appeal. Because the California Supreme Court denied discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned decision on the merits and is the subject of habeas review in this court. See Ylst v. Nunnemaker, 501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).

> The appellate court ruled as follows:
>
> Defendant also claims the trial court violated his federal constitutional right to due process by admitting evidence of an unduly suggestive out-of-court identification that also tainted S.'s subsequent in-court identification. We need not determine whether the identification procedure was unduly suggestive because, assuming it was, the identification itself was nevertheless reliable under the totality of the circumstances.
>
> ….
>
> " 'In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification.' [Citation.] 'We review deferentially the trial court's findings of historical fact, especially those that turn on credibility determinations, but we independently review the trial court's ruling regarding whether, under those facts, a pretrial identification procedure was unduly suggestive.' [Citation.] 'Only if the challenged identification procedure is unnecessarily suggestive is it necessary to determine the reliability of the resulting identification.' [Citation.]" (*People v. Alexander* (2010) 49 Cal.4th 846, 901- 902; *see also People v. Thomas* (2012) 54 Cal.4th 908, 930-931; *Simmons v. United States* (1968) 390 U.S. 377, 384.)
>
> Here, however, we need not determine whether or not the single-photograph identification was the result of an unduly suggestive and unnecessary procedure because, even assuming it was, the totality of the circumstances establishes the identification itself was reliable. S. had ample opportunity to see defendant when he got into her car in the Walmart parking lot and during their drive, particularly in the parking lot at the Jewish temple, where defendant

> told her to pull out and continue driving because that parking lot was so well lit. After defendant let her go following the assault, she provided an accurate description of him to the 911 dispatcher and responding officers. The doorman at the bar across the street from the Walmart immediately recognized the description as fitting defendant, who had been there shortly before the crimes. His image was also captured on the Walmart surveillance system, wearing the same distinctive t-shirt he was wearing at the bar earlier in the night and while kidnapping and sexually assaulting S. later. That shirt was found in defendant's apartment. And, as if that was not enough to demonstrate the reliable nature of S.'s identification, defendant's DNA matched that recovered from S.'s underwear.
>
> As the United States Supreme Court stated in *Neil v. Biggers* (1972) 409 U.S. 188 [34 L.Ed.2d 401]: "It is the likelihood of misidentification which violates a defendant's right to due process . . . ." (*Id.* at p. 198.) The totality of the circumstances in this case reveals no such likelihood.

ECF No. 14-7 at 10-11.

### D. Objective Reasonableness Under § 2254(d)

The appellate court accurately stated the fundamental principle that applies here: absent a significant risk of misidentification, due process does not require the suppression of an arguably unreliable identification. See Biggers, 409 U.S. at 198; Simmons, 390 U.S. at 384. The court's finding that there was no such risk in this case, that "the totality of the circumstances establishes the identification itself was reliable," constitutes neither an objectively unreasonable finding of fact nor an unreasonable application of clearly established federal law. As the court of appeal pointed out, S. had ample opportunity to observe petitioner during the course of the kidnaping, and she had provided accurate descriptions of petitioner to the 911 dispatcher and to responding officers. Accordingly, there was a permissible basis for the jury to find her in-court identification reliable *even if* the photo lineup had been unduly suggestive. Moreover, independent evidence that petitioner was in fact the assailant—including the surveillance video, the T-shirt and the DNA—minimized the likelihood that police use of a suggestive procedure would result in misidentification.

As the trial judge explained in denying the suppression motion, the impact of the photo lineup on the reliability of the identification was properly a jury question. See Perry, 565 U.S. at 245-247 (recognizing that "the jury, not the judge, traditionally determines the reliability of

evidence."). Petitioner's due process rights were adequately protected by the "other safeguards built into our adversary system that caution juries against placing undue weight on eyewitness testimony of questionable reliability"—including the rights to cross-examination, the assistance of counsel, and the constitutional requirement that the government prove guilt beyond a reasonable doubt. Id.

Because the state court judgment did not rely on any objectively unreasonable findings of fact or objectively unreasonable application of Supreme Court precedent, relief is unavailable on this claim.

## II. Claim Two: The Warrantless Seizure of Petitioner's DNA Violated His Fourth Amendment Rights

### A. Petitioner's Allegations and Pertinent State Court Record

Petitioner alleges that the warrantless seizure of DNA samples following his arrest violated his Fourth Amendment protection against unreasonable seizures. ECF No. 1 at 4, 11-12. Swabs of petitioner's inner cheek lining, hands, and penis were taken after his arrest, and a DNA profile was generated that matched DNA from the victim's underwear. Petitioner moved pretrial to suppress the DNA evidence. An evidentiary hearing was held, at the conclusion of which the judge denied the motion. The DNA evidence was accordingly introduced at trial. Petitioner asserted Fourth Amendment error on appeal, and the California Court of Appeal ruled that (1) the warrantless collection of DNA by means of a buccal swab did not amount to an unreasonable seizure, and that (2) even if the swabs of petitioner's hands and penis violated the Fourth Amendment (an issue it was unnecessary to reach), admission of the evidence was harmless beyond a reasonable doubt. ECF No. 14-7 at 11-12. The issue was included in the petition for review that petitioner filed in the California Supreme Court. ECF No. 14-8 at 2-3.

### B. This Claim Is Non-Cognizable in Federal Habeas

Where a state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that the evidence obtained in an unconstitutional search or seizure was introduced at trial. Stone v. Powell, 428 U.S. 465, 482 (1976). Stone effectively renders Fourth Amendment claims

1  unreviewable in federal habeas, except in cases where the state failed to provide a forum for
2  litigation of the issue.  Because petitioner actually litigated his Fourth Amendment claims in the
3  superior court and in the California Court of Appeal, and fairly presented them to the California
4  Supreme Court, it cannot be disputed that he had a full and fair opportunity in state court to seek a
5  remedy for any and all Fourth Amendment violations.  See Stone, 428 U.S. at 494, n. 37.

6  When a state prisoner presents a Fourth Amendment claim in federal habeas, "[t]he
7  relevant inquiry is whether petitioner had the opportunity to litigate his claim, not whether he did
8  in fact do so or even whether the claim was correctly decided." Ortiz-Sandoval v. Gomez, 81
9  F.3d 891, 899 (9th Cir. 1996).  The Ninth Circuit has held that California's statutory framework
10 for litigating suppression issues satisfies the "full and fair opportunity" requirement under Stone
11 v. Powell.  Gordon v. Duran, 895 F.2d 610, 613-14 (9th Cir. 1990).  Because petitioner had the
12 required opportunity to litigate in state court, federal habeas relief is unavailable as a matter of
13 law.  See Myers v. Rhay, 577 F2d 504, 508 (9th Cir. 1978) (even assuming unconstitutional
14 arrest, Stone bars relief); Terrovona v. Kincheloe, 912 F. 2d. 1176, 1178 (9th Cir. 1990) (Stone
15 bars federal review of a state prisoner's warrantless arrest claim).

16 Because relief is categorically unavailable, there is no need for review of the state courts'
17 resolution of the constitutional issue under 28 U.S.C. § 2254(d).  Indeed, this court's review is
18 prohibited by the Supreme Court's pronouncement in Stone that state courts are the final arbiters
19 of claims that evidence, and resulting convictions, have been obtained in violation of the Fourth
20 Amendment.  See Newman v. Wengler, 790 F.3d 876 (9th Cir. 2015) (Stone v. Powell doctrine
21 survives AEDPA, and precludes federal habeas review of state court resolution of Fourth
22 Amendment issues).  This claim must accordingly by denied.

23                                                    CONCLUSION

24     IT IS HEREBY ORDERED that the Clerk of Court shall update the docket to reflect the
25 substitution of Gena Jones as Respondent.  See n.1, supra.

26     IT IS FURTHER RECOMMENDED, for the reasons explained above, that the petition
27 for writ of habeas corpus be denied.

28     These findings and recommendations are submitted to the United States District Judge

assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  See 28 U.S.C. § 2253(c)(2).  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: October 8, 2024

_____
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE